# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

records and information associated with the cellular telephones assigned call numbers 414-252-6585, 414-837-8536, and 414-856-6024, ("the Accounts"), that are more fully described in Attachment A.

Case No. **19-MJ-1210**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:
Title 18, United States Code, Sections 924(c), 1951, 2113, 2119,

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Martin Keck, TFO
*Printed Name and Title*

Sworn to before me and signed in my presence:
Date: 3/4/19

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Martin Keck, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with certain cellular telephones assigned call numbers **414-252-6585, 414-837-8536,** and **414-856-6024** ("the **SUBJECT PHONES**") that are stored at premises controlled by T-Mobile / Metro PCS, a wireless telephone service provider headquartered at 4 Sylvan Way, in Parsippany, New Jersey. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile / Metro PCS to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a federally deputized Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI). I have been a TFO with the FBI since 2018. I have been employed as a law enforcement officer with the Wauwatosa Police Department for over 12 years. I have investigated bank robberies, business robberies, and carjackings, and have been involved in search warrants and interrogations regarding these various offenses. In many cases, I have worked jointly with other local, state, and federal law enforcement partners. I have participated in numerous

1

armed bank robbery, commercial robbery, and carjacking investigations, in violation of Title 18, United States Code, Sections 924(c), 1951, 2113, 2119, and other related offenses. I have also received formal training regarding the same.

3. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

4. The facts in this affidavit come from my personal observations, my training and experience, information obtained from witnesses, and information obtained from other agents during the course of their official duties, all of whom I believe to be truthful and reliable.

5. Based on the facts set forth in this affidavit, there is probable cause that Tongon M. Scott (DOB XX/XX/1996) and Ja'Juan W. Payne (DOB XX/XX/1997) participated in an armed robbery in West Allis, Wisconsin, on February 10, 2019, in violation of Title 18, United States Code, Sections 1951(a) (Hobbs Act Robbery) and Title 18, United States Code, Sections 924(c) and 2 (use of a firearm during a crime of violence).

6. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

7. On February 10, 2019 at approximately 6:36 a.m., West Allis Police Officers responded to the Speedway gas station, located at 9111 W. National Avenue, in the city of West Allis, County of Milwaukee, State of Wisconsin, to investigate an armed robbery complaint. The West Allis Police Dispatch Center advised the offender in the armed robbery was a black male, who displayed a handgun, and was last seen in a dark blue or black mini-van. West Allis Police Officers responded to the business at which time the West Milwaukee Police Department advised they located the suspect vehicle and initiated a vehicle pursuit.

8. Law enforcement spoke with the assistant manager of the business, A.V., and employee, T.L., who was working as a cashier. A.V. said she was working the cash register when an unknown suspect described as a black male, unknown age, 6'01" tall, 160-165 pounds, wearing a blue winter jacket, blue ski mask, and white gloves entered the store. A.V. stated the suspect approached the cashier register area and displayed a black handgun with an extended magazine and pointed the firearm at her. The suspect told A.V. "Give me all the money" and "Underneath the drawer too." A.V. opened her cash register and handed the suspect an estimated $200 in U.S. Currency. A.V. stated a citizen inside the store approached the suspect from behind and hit the suspect in the head with a glass Starbucks coffee drink. A.V. stated the suspect ran out of the store and she did not know where he went from there. A.V. stated there was a blue Caravan parked directly in front of the business when this happened and the vehicle fled in an

3

unknown direction when the suspect ran. A.V. said the citizen did not remain on scene and she does not know the identity of the citizen. A.V. did not consent to being robbed.

9. T.L., the cashier employed at Speedway, advised law enforcement that she is the first shift cashier and started work at 6:00 a.m. on February 10, 2019. T.L. said she was behind the counter when a male, 6' tall, 180 pounds with layers on, wearing a ski mask, hoodie, black gloves, blue coat, shiny sunglasses, and holding a black gun with an extended magazine came into the store. T.L. stated the male told her to "Give me the money, open the register." T.L. stated she unlocked the register and gave the male the money. The suspect then told T.L. he wanted to look inside the register, so she pulled out the drawer of the register. She stated the male put the money into his pocket. During this time, she stated there was a customer inside the business. The customer came toward the male and threw a bottle at the suspect. She stated at that point, she and A.V. both ducked behind the counter and did not see where the offender went. T.L. stated she asked the male who threw the item at the offender to remain on scene but he left before officers arrived on scene.

10. A receipt from the Speedway store reflects that a total amount of $227.09 in U.S. Currency was stolen during the robbery.

11. Video surveillance was obtained from Speedway Gasoline Station located at 9111 W. National Avenue on the morning of February 10, 2019. I reviewed this video surveillance, which depicts a dark-colored minivan pull up to

4

the Speedway in front of the business. A subject exited the front passenger's side door and walked toward the entrance. During the robbery, the suspect was wearing a white glove(s) and holding an object that appears to be a black pistol with a long extended magazine. The offender was wearing a blue jacket with the hood up (over the head) and black shoes. The video captures the cashiers giving the robber money at gunpoint. The video footage further depicts a male in the store approach the robber and strike him over the head with what was later identified as a glass bottle. Finally, video from the exterior of the store depicts the robber running from the store and crossing the parking lot on foot, with the dark-colored van following behind.

12. A West Milwaukee Police Officer located the suspect vehicle, later identified as a 2014 Dodge van, blue in color, (VIN 2C4RDGCG7ER349859), traveling eastbound on W. National Avenue through the green light at W. Greenfield Ave. The officer began following behind the van, eastbound on W. National Avenue. The van drove through a red light at S. 60th Street, at which point the officer activated the emergency lights and sirens on his fully marked police vehicle. The officer's pursuit of the van lasted approximately 3 minutes and went a distance of approximately 3.6 miles. The van reached speeds in excess of 100 MPH on city streets. The van ultimately crashed at 1653 S. 25th Street in the City of Milwaukee. Two male occupants fled the vehicle upon the crash.

13. A foot chase of the two male suspects then ensued. Officers from the West Allis Police Department, the Milwaukee County Sheriff's Office, the

5

Milwaukee Police Department and the West Milwaukee Police Department responded to the area and located the two suspects. One suspect, identified as Ja'Juan W. Payne, was located in the yard at 1646 S. 26th Street. After a physical altercation with Payne, officers arrested him. At this time, he was wearing a blue jacket, black pants, and black shoes. He was observed with a laceration on his head that was bleeding. Payne stated that the cut to his forehead was from when he was hit on the head with a bottle. Payne was taken to the West Allis Medical Center for medical evaluation and treatment.

14. Upon a search of Payne at the medical center, officers recovered from Payne's right rear pocket a black LG smart phone (Device #1), which was seized as evidence. Additionally, near the location of Payne's arrest, officers found a blue and black Alcatel flip style cell phone (Device #2) in the bushes in front of 1646 S. 26th Street, which was ringing. This phone was also seized as evidence.

15. With respect to the second suspect, a citizen at 1737 S. 25th Street shouted to officers a subject was in her backyard. As the citizen was informing the officers, the suspect fled from the backyard to S. 25th Street. Officers began pursuing the suspect on foot. The second suspect, identified as Tongon M. Scott, was taken into custody at 1814 S. 24th Street in the City and County of Milwaukee.

16. After clearing from Speedway located at 9111 W. National Avenue, law enforcement responded to the vehicle crash scene located in the City and County of Milwaukee and observed the blue Dodge Caravan with no rear registration plate

displayed. This vehicle appeared to be the same vehicle observed in the video surveillance and that which was described by the citizen witness he spoke to.

17. The van used in the armed robbery was listed as stolen with the Milwaukee Police Department on January 11, 2019.

18. Law enforcement recovered the following from the Dodge Caravan: a black wallet on the driver's seat of the minivan containing a Wisconsin photo identification paper for Tongon M. Scott; a black LG smart phone in the center console (Device #3); one pair of white gardening style gloves from the center console; a matching pair of white gloves from the front passenger door; a pair of reflective style sunglasses on the front passenger floor board; and a longer black hat from the third row bench seat.

19. Law enforcement also recovered a $5 bill approximately 20 feet west of the van's resting location. Approximately 50 feet in front of the $5 bill was a separate $1 bill. Law enforcement also recovered a $10 bill in front of 2518 W. Mitchell Street.

20. Additionally, recovered under exterior steps behind 1642 S. 26th Street in the City and County of Milwaukee was a pile of cash under a wooden set of stairs leading from the exterior door to the residence. The space under the steps was covered by a wooden lattice on both sides. Located on the south side of the steps was a $5 bill in the snow against the lattice. Upon further inspection, a pile of loose cash totaling $232 that had been stuffed under the steps through the 3" by 3" gaps in the lattice was observed.

7

21. Law enforcement also searched the gang way between 1626 S. 26th Street and 1630 S. 26th Street, which was in Payne's attempted escape path. Law enforcement located and recovered a black semi-automatic pistol with a 31 round extended magazine inserted in a basement window well located on the north side of 1630 S. 26th Street in the City and County of Milwaukee. The firearm is more specifically described as a Glock 26 9mm compact semi-automatic pistol bearing serial number ZME427. The inserted magazine contained 31 rounds of 9 mm ammunition and there was one round of ammunition chambered in the firearm. The firearm matches the victims' description of the gun used in the robbery. It is also consistent with the gun depicted on the Speedway surveillance footage.

22. A Wisconsin criminal history check indicates that Ja'Juan W. Payne is a convicted felon.

23. On or about February 10, 2019, after Payne was medically cleared from Aurora West Allis Medical Center, he was conveyed to the West Allis Police Department at which time officers positively identified Payne's identity through the Morpho Fingerprint Machine.

24. On or about February 10, 2019, co-actor Scott gave a *Mirandized* statement wherein he stated that he stole the blue minivan a few weeks before the Speedway robbery. He identified Payne and further stated that Payne said in the van that he was going to "hit" the Speedway. Scott admitted knowing that he thought it meant Payne would rob the store, although he stated he thought it was a "joke." On this same date, Scott provided verbal and written consent to search his

8

cellular phone (Device #3). Scott provided a corresponding telephone number for his cellular phone of **(414) 856-6024** and the pass code.

25. Investigators from the West Allis Police Department applied for and were granted a search warrant authorizing a search of Devices #1 and #2. The warrant was signed by the Honorable Janet Protasieciwz, Judicial Court Judge of the First Judicial District of Wisconsin, on February 19, 2019.

    a. A forensic examination was conducted of the black LG smart phone's (Device #1) SIM card utilizing Cellebrite software. The examination revealed the phone had a phone number of **414-837-8536**.

    b. A forensic examination was conducted of the blue and black Alcatel flip phone's (Device #2) SIM card utilizing Cellebrite software. The examination revealed the phone had a phone number of **414-252-6585**.

    c. A forensic examination was conducted of the black LG smart phone (Device #3) utilizing Cellebrite software. The examination revealed the phone had a phone number of **414-856-6024**.

26. I submit that there is probable cause to believe that the records identified in Attachment B, which correspond to telephone numbers **414-252-6585**, **414-837-8536** and **414-856-6024**, are likely to constitute evidence of the above-described armed robbery. According to law enforcement databases, Metro PCS was the Provider for these telephone numbers during the time period at issue. Affiant knows through prior investigations that T-Mobile is the parent company to Metro PCS.

27. In my training and experience, I have learned that T-Mobile / Metro PCS is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

28. Based on my training and experience, I know that T-Mobile / Metro PCS can collect cell-site data about the **SUBJECT PHONES**. I also know that wireless providers such as T-Mobile / Metro PCS typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

10
Case 2:19-mj-01210-WED   Filed 06/20/19   Page 11 of 18   Document 1

29.     Based on my training and experience, I know that wireless providers such as T-Mobile / Metro PCS typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile / Metro PCS typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **SUBJECT PHONES'** user or users and may assist in the identification of co-conspirators.

## AUTHORIZATION REQUEST

30.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

31.     I further request that the Court direct T-Mobile / Metro PCS to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on T-Mobile / Metro PCS, who will then compile the requested records at a time

convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

# ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with the cellular telephones assigned call numbers **414-252-6585**, **414-837-8536**, and **414-856-6024**, ("the Accounts"), that are stored at premises controlled by T-Mobile / Metro PCS ("the Provider"), headquartered at 4 Sylvan Way, in Parsippany, New Jersey.

1

## ATTACHMENT B

## Particular Things to be Seized

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Accounts listed in Attachment A for the time period February 7, 2019 through February 12, 2019:

    a. The following information about the customers or subscribers of the Accounts:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID");

1

Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

    viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Accounts, including:

    i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1951(a) & 924(c) during the time period February 7, 2019 through February 12, 2019.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by T-Mobile / Metro PCS, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of T-Mobile / Metro PCS. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile / Metro PCS, and they were made by T-Mobile / Metro PCS as a regular practice; and

b. such records were generated by T-Mobile / Metro PCS's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-Mobile / Metro PCS in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by T-Mobile / Metro PCS, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

| | |
|---|---|
| Date | Signature |